# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 8, 2011        Decided March 16, 2012

No. 11-1019

UNITED STATES DEPARTMENT OF COMMERCE,
PATENT AND TRADEMARK OFFICE,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

PATENT OFFICE PROFESSIONAL ASSOCIATION,
INTERVENOR

On Petition for Review of a Final Decision
of the Federal Labor Relations Authority

*Howard S. Scher*, Attorney, United States Department of Justice, argued the cause for the petitioner. *Tony West*, Assistant Attorney General, and *William Kanter* and *Thomas M. Bondy*, Attorneys, were on brief.

*Rosa M. Koppel*, Solicitor, Federal Labor Relations Authority, argued the cause for the respondent. *Joyce G. Friedman*, Attorney, Federal Labor Relations Authority, entered an appearance.

*Richard J. Hirn* argued the cause for intervenor Patent Office Professional Association in support of the respondent.

*Gregory O'Duden*, *Larry J. Adkins*, *Peyton H.N. Lawrimore*, *Andres M. Grajales* and *Teresa J. Idris* were on brief for the *amici curiae*, American Federation of Government Employees *et al.* in support of the respondent.

Before: HENDERSON, ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Opinion concurring in the judgment filed by *Circuit Judge* ROGERS.

KAREN LECRAFT HENDERSON, *Circuit Judge*: The Patent and Trademark Office of the United States Department of Commerce (PTO or Agency) seeks review of a decision of the Federal Labor Relations Authority (FLRA or Authority) upholding an arbitrator's award in favor of the Patent Office Professional Association (POPA or Union). *U.S. Dep't of Commerce Patent & Trademark Office*, 65 F.L.R.A. 290 (2010) (*PTO II*). The arbitrator concluded PTO committed an unfair labor practice in violation of the Federal Service Labor-Management Relations Statute (FSLMRS or Statute), 5 U.S.C. § 7116(a)(1) and (5), when it repudiated a provision in an agreement requiring that it make an annual request of the Office of Personnel Management (OPM) to increase PTO's special schedule pay rates and, if OPM refuses, to discuss "substantially equivalent alternatives" with POPA. *Arbitration Decision in re Patent Office Prof'l Ass'n v. U.S. Dep't of Commerce, Patent & Trademark Office*, FMCS Case No. 04-01463-3 (Arbitral Award of Arbitrator Arrigo) (July 25, 2006) (*Award II*). In particular, PTO challenges the Authority's determination that the provision constitutes an "appropriate arrangement" under 5 U.S.C. § 7106(b)(3). We grant PTO's petition on the ground that, under the collateral estoppel doctrine, the Authority was bound by its earlier decision concluding the provision did not constitute an appropriate arrangement. *See U.S. Dep't of Commerce, Patent & Trademark Office*, 60 F.L.R.A. 839 (2005) (*PTO I*),

*pet. for review dismissed*, *Patent Office Prof'l Ass'n v. FLRA*, 180 F. App'x 176 (D.C. Cir. 2006).

**I.**

In 2000, PTO patent examiners' wages, like those of most executive branch employees, were determined pursuant to the General Schedule (GS). Because it was experiencing problems recruiting and retaining employees, PTO requested and obtained OPM approval to pay employees special pay rates exceeding the comparable GS rates by ten or fifteen per cent, depending on the grade. Over time, however, special rates decrease in value relative to the corresponding GS rates because, while both rates receive annual general increases, only the latter include annual locality increases. Accordingly, PTO and POPA negotiated the following provision in an agreement effective January 2001:

> The [PTO] shall request OPM approval for the next five years to increase the special pay schedule so as to maintain the 10% and 15% salary differentials relative to the updated GS rates, in a manner consistent with OPM regulations. If OPM refuses the request, the Agency shall enter into discussions with POPA in order to provide substantially equivalent alternatives.

Agreement on Initiatives for a New Millennium between [PTO and POPA], § A.2 (JA 69) (Millennium Agreement).

In 2002, federal employees in the Washington, D.C. region received a 3.6% general wage increase and a 1.17% locality pay increase. Pursuant to section A.2 of the Millennium Agreement, in February 2002, PTO requested that OPM increase the special pay rate by 1.17% to maintain the ten and fifteen per cent differentials, subsequently lowering the request to 1%. OPM denied PTO's request on the ground PTO's filings did not show it was "experiencing or . . . likely to experience significant handicaps in recruiting or retaining patent professionals." *Award II* at 11 (internal quotations omitted). OPM

recommended that PTO explore "the strategic use of other compensation flexibilities to address targeted recruitment and retention problems." *Id.* Accordingly, PTO entered into discussions with the Union regarding "substantially equivalent alternatives" pursuant to the second sentence of section A.2. When the discussions proved fruitless, the Union filed a grievance, which was then submitted to arbitration.

The arbitrator concluded that PTO had violated section A.2 of the Millennium Agreement and ordered it to "engage in . . . discussions [with POPA] in good faith with a sincere resolve to find a way to make-up for the lost locality pay." *In re Arbitration Between Patent & Trademark Office & Patent Office Prof'l Ass'n*, FMCS Case No. 04-00138 at 16 (Oct. 1, 2001) (Arbitral Award of Arbitrator Evans) (*Award I*). In his order, Arbitrator Evans "found that Section A.2 was intended to address the adverse effect of special rate erosion that would occur over time as non-special rate employees received locality pay increases." *PTO I*, 60 F.L.R.A. at 842 (citing *Award I* at 12).

On review, the Authority set aside the arbitral award as violating section 7106 of the FSLMRS. The Statute generally imposes on a federal agency a duty to bargain in good faith with a public employee union over conditions of employment but section 7106(a) exempts from the duty certain "management rights," including the right to retain its employees. *See U.S. Dep't of the Treasury v. FLRA*, ___ F.3d ___, ___; No. 11-1102, slip op. at 4 (D.C. Cir. Feb. 7, 2012); 5 U.S.C. § 7106(a)(2)(A). Nonetheless, an agency must bargain over a proposal—including one that affects a management right—if the proposal constitutes an " 'appropriate arrangement[] for employees adversely affected' by the exercise of management rights." *Nat'l Ass'n of Gov't Emps., Inc. v. FLRA*, 179 F.3d 946, 948 (D.C. Cir. 1999) (quoting 5 U.S.C. § 7106(b)(3)). In *PTO I*, the Authority concluded section A.2 affected PTO's

management right to retain employees and was not an "appropriate arrangement" within the meaning of 5 U.S.C. § 7106(b)(3) because, "as interpreted and enforced by the Arbitrator," it sought to "ameliorate[] adverse effects" that result not from the exercise of a management right but from "the operation of law, specifically, the fact that under 5 C.F.R. § 531.606, special rate employees are not permitted to receive locality pay adjustments." 60 F.L.R.A. at 842. Thus, the Authority concluded section A.2 was not a statutory "arrangement" at all and set aside the arbitral award as "contrary to management's right to retain employees under § 7106(a)(2)(A)." *Id*. at 842, 843. In making this determination, the Authority specifically rejected as "unsupported" POPA's claim that section A.2 was intended as an arrangement for employees adversely affected by PTO's decision "to eliminate paper files and to include a customer service element in the performance plans."[1]

In 2003, the locality pay rate for the Washington, D.C. region again increased by 1.17%. PTO determined it could not certify to OPM that a special pay rate increase was "critical to the mission of the Agency" and, accordingly, notified POPA it would not submit a request that OPM increase the rate. *PTO II*,

---

[1]According to the FLRA, POPA asserted in *PTO I*

> that elimination of the paper files adversely affects employees by requiring them to spend virtually their entire work day tethered to a computer screen[,] that computer images of patents are inferior to paper copies, that there are problems with conducting key word searches of old patents on computers, and that computer patents do not include examiners' notes that were in paper patents and which facilitated the patent search for examiners.

60 F.L.R.A. at 842 (quotation marks omitted; brackets in original).

65 F.L.R.A. at 291. POPA again filed a grievance, which was again submitted to arbitration.

Arbitrator Arrigo found section A.2 affected the Agency's management right to retain employees because " 'the essential facts and circumstances' " were " 'substantially identical' " to *PTO I. Id.* at 292 (quoting *Award II* at 24). He further concluded that section A.2 was an "appropriate arrangement" because " 'the entirety of [§] A,' including § A.2, 'was negotiated as a quid pro quo for the elimination of paper patents and the addition of customer service duties for employees[,]' two changes desired by the Agency and opposed by the Union." *Id.* (quoting *Award II* at 24) (alteration in original). Arbitrator Arrigo specifically found that "the linkage between a special pay schedule and the paper file and customer service issues was established 'in every document concerning the discussions between the parties,' " *id.* (quoting *Award II* at 25), and the special pay rate provisions were "a 'balm' to 'ameliorate the adverse effects upon employees for the Union's acceding to the Agency's desire to exercise its management rights regarding the elimination of paper files . . . and employees being assigned additional duties' and were enforceable as appropriate arrangements under § 7106(b)(3)." *Id.* (quoting *Award II* at 25-26). He further determined PTO's breach of both sentences of section A.2—by declining to submit a request to OPM, then failing to enter discussions with POPA—" 'went to the heart of the parties' agreement' " because it was a " 'critical part' of § A, which was, in turn, necessary to [POPA's] acceptance of the rest of the [Millennium Agreement]." *Id.* (quoting Award II at 27). Accordingly, Arbitrator Arrigo concluded PTO repudiated the agreement in violation of 5 U.S.C. § 7116(a)(1) and (5).[2] He

---

[2]The two subsections provide:

(a) For the purpose of this chapter, it shall be an unfair labor practice for an agency—

decided that "the appropriate remedy was to 'require the Agency to fulfill its obligations under the agreement and to "enter discussions with [the Union] in order to provide substantially equivalent alternatives" to the erosion of the agreed-upon pay differentials set forth in the agreement,' " to include "interest 'on any money the employees might receive pursuant to the discussions envisioned in [§] A.2.' " *Id.* at 292-93 (quoting *Award II* at 29-30 (quoting § A.2)).

PTO excepted to the award and the FLRA sustained it. The FLRA first upheld Arbitrator Arrigo's unchallenged finding that section A.2 affected management's right to retain employees. The Authority further affirmed his determination that section A.2 was an arrangement, relying on his finding "that the entire subject of special pay was negotiated 'to provide a "balm" to the Union which would ameliorate the adverse effects upon employees' of 'the Agency's desire to exercise its management rights regarding the elimination of paper files.' " 65 F.L.R.A. at 295 (quoting *Award II* at 25-26). Finally, the Authority considered whether the arrangement was "appropriate" under the "abrogation" standard, which it recently re-adopted in *U.S. Environmental Protection Agency*, 65 F.L.R.A. 113 (2010) (*U.S. EPA*).[3] Under the abrogation standard, the Authority assesses

---

> (1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;
>
> . . . [or]
>
> (5) to refuse to consult or negotiate in good faith with a labor organization as required by this chapter; . . . .

5 U.S.C. § 7116(a)(1), (5).

[3]Before its decision in *U.S. EPA*, the Authority reviewed arbitral awards using its "excessive interference standard" under which the enforcement of a contract provision in the award is appropriate unless

"whether the arbitration award 'precludes [the] agency from exercising' the affected management right"—if it does not, the Authority will "find that the arrangement is appropriate within the meaning of § 7106(b)(3)." *PTO II*, 65 F.L.R.A. at 296 (quoting *Dep't of the Treasury, U.S. Customs Serv.*, 37 F.L.R.A. 309, 314 (1990)) (alteration in *PTO II*). In *PTO II*, the Authority decided section A.2 satisfied the standard because PTO "provided no basis for finding that the award precludes the Agency from exercising its right to retain employees." *Id.* at 296. Having approved section A.2, the Authority upheld Arbitrator Arrigo's finding that PTO repudiated the first sentence of section A.2 in failing to submit a request to OPM and thereby committed an unfair labor practice in violation of 7116(a)(1) and (5) of the Statute. Asserting that Arbitrator Arrigo's "finding of repudiation of the first sentence of § A.2 provides a separate and independent basis for his finding of a violation of § 7116(a)(1) and (5)," the Authority found it "unnecessary to determine whether the Arbitrator erroneously found a repudiation of the second sentence of § A.2." 65 F.L.R.A. at 297. PTO filed a timely notice of appeal.

## II.

PTO contends, inter alia, that collateral estoppel precluded the Authority from finding section A.2 constituted an

---

it "excessively interferes with management's rights." *U.S. Dep't of Justice, Fed. Bureau of Prisons*, 58 F.L.R.A. 109, 111 (2002). In *U.S. EPA*, the Authority re-adopted the abrogation standard, which it had previously applied to arbitral awards from 1990 until 2002. *See Dep't of the Treasury, U.S. Customs Serv.*, 37 F.L.R.A. 309, 313-14 (1990) (replacing excessive interference standard with abrogation standard); *Fed. Bureau of Prisons*, *supra* (reinstating excessive interference standard).

"arrangement." We agree.[4]

Under FLRA precedent, collateral estoppel, or issue preclusion, requires a showing of five elements:

> Before the doctrine of collateral estoppel can be applied, it must be demonstrated that: (1) the same issue was involved in both cases; (2) that issue was litigated in the first case; (3) resolving it was necessary to the decision in the first case; (4) the decision in the first case, on the issue to be precluded, was final; and (5) the party attempting to raise the issue in the second case was fully represented in the first case.

*U.S. Dep't of Energy W. Area Power Admin., Golden, Colo.,* 56 F.L.R.A. 9, 11 (2000) (citing *U.S. Dep't of the Air Force, Scott Air Force Base, Ill.*, 35 F.L.R.A. 978, 982 (1990)). If all five elements are met, the Authority is bound by its findings in the earlier case. *See Scott Air Force Base*, 35 F.L.R.A. at 981. All five are met here.

Regarding the first and second elements, in each proceeding the parties litigated the issue whether section A.2 constituted an appropriate arrangement or, more fundamentally, whether it constituted an arrangement at all. In *Award I*, Arbitrator Evans "found that Section A.2 was intended to address the adverse effect of special rate erosion that would occur over time as non-special rate employees received locality pay increases." *PTO I*, 60 F.L.R.A. at 842 (citing *Award I* at 12). The Authority upheld this finding of intent but concluded that section A.2 was not—indeed, could not—be an "arrangement" within the meaning of section 7106(b)(3) because it "ameliorate[d] adverse

---

[4]In light of our disposition, we do not address PTO's alternative grounds for review, including its challenge to the Authority's adoption of the abrogation standard. *See supra* p. 7 note 3 & accompanying text.

effects that result from the operation of law, not the exercise of a management right." *Id.*

In *Award II*, Arbitrator Arrigo addressed the same issue, reaching a contrary conclusion. Recognizing that " 'the essential facts and circumstances' in the case before him were 'substantially identical' to those found by the Authority in *PTO I*," he therefore "found, in accordance with that decision, that § A.2 of the [Millennium Agreement] affected management's right to retain employees." *PTO II*, 65 F.L.R.A. at 292 (quoting *Award II* at 24-25). He nonetheless found that section A.2 was indeed an arrangement because " 'the entirety of [§] A,' including § A.2, 'was negotiated as a quid pro quo for the elimination of paper patents and the addition of customer service duties for employees'[—]two changes desired by the Agency and opposed by the Union." *Id.* (quoting *Award II* at 24) (bracketed material deleted).[5] In *PTO II*, the Authority upheld this determination notwithstanding it had rejected the very same finding in *PTO I* "as unsupported." 60 F.L.R.A. at 842-43. In short, despite contrary outcomes, the two FLRA decisions involved the same issue—namely, whether section A.2 constitutes an (appropriate) arrangement.

The FLRA contends the two cases did not involve the same issue because they involved different arbitrators interpreting

---

[5]The "entirety" of section A covers the "Uniform Special Pay Schedule," including the directive in section A.1 that PTO submit an initial request for special rates in 2001 as well as the language in section A.2 governing the request procedure for subsequent years. In *PTO I*, the Authority stated: "Special rates are, by law, a means to ameliorate recruitment and retention problems." (citing 5 C.F.R. § 530.303(a) ("OPM may increase the minimum rates otherwise payable under the pay schedules . . . to the extent it considers necessary to overcome existing or likely significant handicaps in the recruitment or retention of well-qualified personnel . . . .")). 60 F.L.R.A. at 841.

section A.2 in different awards under different circumstances. According to the Authority, one arbitrator's interpretation of a contract provision should not be binding on a subsequent arbitrator's interpretation in a different proceeding.  But it is not *Arbitrator Evans's interpretation* in *Award I* that is binding here—rather, it is *the Authority's legal conclusion* in *PTO I* that section A.2 does not qualify as an appropriate arrangement because it "ameliorates adverse effects that result from the operation of law, not the exercise of a management right."  60 F.L.R.A. at 842; *see Scott Air Force Base*, 35 F.L.R.A. at 981 (on exceptions from arbitrator decision, "Authority is bound by its finding" in previous decision reviewing administrative law judge's unfair labor practice decision); Resp't's Br. 21 ("The Authority's decision in *PTO I* set aside the First Award as contrary to law . . . .").  The force of the Authority's conclusion applies no less to the facts in *PTO II* as to those in *PTO I*.

The Authority further attempts to distinguish the cases by asserting that *PTO I* involved a violation of section A.2's second sentence while *PTO II* found a breach only of its first sentence only.  *PTO I*, however, made no distinction between the intent behind the first and the second sentences, stating: "Section A.2, as interpreted and enforced by the Arbitrator, ameliorates adverse effects that result from the operation of law, not the exercise of a management right."  60 F.L.R.A. at 842. Moreover, we do not see how the two intertwined sentences can be viewed in isolation from each other (or assigned different purposes) inasmuch as they operate together, in sequence, to offset the annual pay erosion resulting from "the fact that under 5 C.F.R. § 531.606, special rate employees are not permitted to receive locality pay adjustments," 60 F.L.R.A. at 842; *see* also *Award I* at 12 ("Section A.2 set up a two-track process to deal with the potential of locality pay erosion.  The first track is set forth in the first sentence of Section A.2.  It requires PTO to submit a request to OPM for a special pay rate adjustment to keep-up with the locality pay awarded in the Washington, DC

metropolitan area to GS employees. If that failed, which happened here, the parties ultimately agreed to go down a second track to find an alternative way to make-up for locality pay erosion (for 5 years)."). Thus, the "arrangement" issue was both involved and litigated in each proceeding.[6]

The third through fifth collateral estoppel elements are plainly satisfied: In *PTO I*, the resolution of the "arrangement" issue was necessary in order to decide whether section A.2 was an appropriate arrangement so as to be enforceable under section 7106(b)(3) notwithstanding it affected the management right to retain employees; *PTO I* was a final FLRA decision which was judicially unreviewable, *see Patent Office Prof'l Ass'n v. FLRA*, 180 F. App'x 176 (D.C. Cir. 2006) (dismissing petition for review for lack of jurisdiction because "FLRA decision reviewing an arbitration award is statutorily foreclosed 'unless the order involves an unfair labor practice under section 711[6].' " (quoting 5 U.S.C. § 7123(a)(1))); *see also Scott Air Force Base*, 35 F.L.R.A. at 983 ("[U]nless and until a Federal court of appeals denies enforcement to a decision of the Authority, that decision must be treated as a final adjudicatory action."); and POPA and PTO were fully represented by counsel throughout each proceeding.

Finally, we reject Intervenor POPA's claim that the court lacks jurisdiction to address the collateral estoppel claim because PTO failed to raise it before the Authority. *See* 5 U.S.C. 7123(c) ("No objection that has not been urged before

---

[6]POPA argues the appropriate arrangement issue was not "litigated" in the first proceeding, asserting: "In *PTO I*, Arbitrator Evans did *not* address the issue of whether the [Millennium Agreement], or any part of it, was intended as an 'appropriate arrangement' within the meaning of § 7106(b)(3). It simply was not an issue in the first arbitration case." Intervenor's Br. 24-25 (emphasis in original). The issue was thoroughly addressed, however, on review before the Authority.

the Authority, or its designee, shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances."). Unlike our concurring colleague, we do not find it "questionable" whether PTO adequately raised the objection below. *See* Concurrence at 2-3. While it did not use the magic words "collateral estoppel," PTO nonetheless argued the substance of a collateral estoppel defense in its exceptions to *Award II*. There, it cited *PTO I* as "binding Authority precedent," in which "[t]he Authority has already determined that Section (A)(2) of the Millennium Agreement is not an arrangement" because it " 'ameliorates adverse effects that result from the operation of law, not the exercise of a management right.' " Agency's Exceptions to Arbitrator's Award at 14, *PTO II* (Aug. 28, 2006) (JA 14) (quoting *PTO I*, 60 F.L.R.A. at 842). The Authority understood this argument to implicate collateral estoppel. *See PTO II*, 65 F.L.R.A. at 295 n.5 (rejecting argument "Arbitrator was collaterally estopped from finding § A.2 to be an appropriate arrangement" "[t]o the extent that the Agency's exceptions can be construed as [so] arguing"); *id.* at 301 (Member Beck, dissenting in part) ("[T]he arbitral proceedings and the Agency's exceptions are rife with collateral estoppel implications. Both parties and the Arbitrator recognized the implications of the Authority's prior decision and the Agency addressed the impact of that decision throughout its exceptions." (internal citations omitted)). We do as well.

For the foregoing reasons, we conclude that POPA was estopped from arguing section A.2 is an appropriate arrangement intended to lessen the adverse effects from the elimination of paper files and addition of customer service

14

duties and that the Authority should have so held.[7]  Accordingly, we grant PTO's petition for review.

*So ordered.*

---

[7]We see no reason to deviate, as our concurring colleague suggests, from the general rule that "a valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court."  Restatement (Second) of Judgments § 83(1).  It is true that that the rules are " 'applied more flexibly to administrative adjudications than to judicial proceedings,' " Concurrence at 8-9 (quoting *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1080-81 n.5 (D.C. Cir. 1987) (en banc))—to take into account that "an ambiguous or broadly worded statute may admit of more than one interpretation." *Id*. at 1080-81 n.5 —but the rules nonetheless *are* applied.   And this case involves no administrative peculiarity requiring that they be modified.  Nor does this case suffer from the flaw—fatal in *Clark-Cowlitz* that the party asserting preclusion (a losing power plant license applicant) was not a losing party in the earlier proceeding on which preclusion was premised.  Rather, the applicant and the Commission had been "fellow travelers" on the prevailing side of the earlier proceeding. *Id*. at 1080.  Accordingly, the purpose underlying preclusion—which is "meant to provide an affirmative defense that one party to a prior proceeding may raise against another party that took an adverse position in that proceeding" and "to prevent parties from rearguing issues they have already lost," *id*. at 1080 n.5—would not have been served. *See id*. Here, by contrast, the POPA sought to relitigate in *PTO II* the issue it had *lost* in *PTO I*.  We thus face the classic issue preclusion scenario.

ROGERS, *Circuit Judge*, concurring in the judgment: I write separately regarding the distinction between the collateral estoppel doctrine and the Administrative Procedure Act's requirement, as part of the prohibition on arbitrary or capricious agency action, that if an agency departs from its precedent it must provide a reasoned explanation for its decision to do so. Traditionally, precedent binds *adjudicators* and collateral estoppel precludes *parties*, yet the Authority conflates the two doctrines. Because the Authority has not provided a reasoned explanation for its departure from its precedent in *U.S. Dep't of Commerce, Patent & Trademark Office*, 60 F.L.R.A. 839 (2005) ("*PTO I*"), *pet. for review dismissed, Patent Office Prof'l Ass'n v. FLRA*, 180 F. App'x 176 (D.C. Cir. 2006), I would grant the petition for review without reaching the question of whether the Authority was arbitrary and capricious in its application of its own collateral estoppel doctrine.

## I.

The Patent and Trademark Office ("the PTO") makes two distinct, but related, claims regarding the Authority's treatment of its precedent. The court's review of both is to determine whether the Authority's order was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 7123(c) (incorporating 5 U.S.C. § 7106's standards); *Nat'l Treasury Emps. Union v. FLRA*, 399 F.3d 334, 337 (D.C. Cir. 2005). First, the PTO contends that the Authority unlawfully departed from its precedent in *PTO I* without providing a reasoned explanation. The Authority "must either follow its own precedent or 'provide a reasoned explanation for' its decision to depart from that precedent." *Nat'l Fed'n of Fed. Emps. v. FLRA*, 412 F.3d 119, 124 (D.C. Cir. 2005) (quoting *Local 32, Am. Fed'n of Gov't Emps. v. FLRA*, 774 F.2d 498, 502 (D.C. Cir. 1985)). Second, the PTO contends that the Authority erred in applying its collateral estoppel doctrine, which it first adopted in *Dep't of the Air Force, Scott Air Force Base, Ill.*, 35

F.L.R.A. 978, 982–83 (1990). Here, the PTO observes that the Authority accepted the PTO's "binding precedent" argument as a collateral estoppel argument. The second contention, however, only needs to be considered if the court rules in favor of the Authority as to the first. If the Authority did *not* provide a reasoned explanation for its departure from its precedent, our inquiry ends. If it did, then the court must determine if the Authority was arbitrary and capricious in applying its collateral estoppel doctrine.

**A.**

The court grants the petition on the basis of collateral estoppel. *See* Op. at 10–12. There are good reasons not to address this argument.

First, it is questionable whether the PTO sufficiently raised the issue in its exceptions to the *PTO II* arbitrator's award, and thus whether the court has jurisdiction to address this argument. "No objection that has not been urged before the Authority, or its designee, shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances." 5 U.S.C. § 7123(c). The PTO referred to *PTO I* as "binding precedent" in its exceptions but did not mention "collateral estoppel" or "issue preclusion." Agency's Exceptions to Arbitrator's Award at 14, *PTO II* (Aug. 28, 2006). The Authority's collateral estoppel doctrine, which it seemingly applies to itself, *see infra* Part I.B.,involves a five-part test, *see Scott Air Force Base*, 35 F.L.R.A. at 982–83, no factor of which was expressly mentioned in PTO's exceptions. A "generalized objection" that "implicitly" raises arguments is insufficient to satisfy the jurisdictional requirement. *See U.S. Dep't of Commerce, Nat'l Oceanic & Atmospheric Admin. v. NLRB*, 7 F.3d 243, 245 (D.C. Cir. 1993); *see Nat'l Ass'n of Gov't Emps., Local F5-136 v. FLRA*, 363 F.3d 468, 479–80

(D.C. Cir. 2004) (construing NLRB and FLRA jurisdictional statutes identically).

Although the dissenting Member in *PTO II* would have ruled that the Authority was bound by collateral estoppel to apply its decision in *PTO I*, he noted only that the PTO's exceptions were "rife with collateral estoppel *implications*." *PTO II*, 65 F.L.R.A. at 301 (Member Beck, dissenting) (emphasis added). The majority's discussion appears only in a brief footnote, dismissing the claim "[t]o the extent that the [PTO]'s exceptions can be *construed* as arguing" collateral estoppel. *Id.* at 295 n.5 (emphasis added). Even though the Authority may have addressed the issue, "[s]ection 7123(c) *requires a party* to present its own views to the Authority in order to preserve a claim for judicial review." *U.S. Dep't of the Treasury v. FLRA*, __ F.3d __, __; No. 11-1102, slip op. at 10 (D.C. Cir. Feb. 7, 2012) (internal quotation marks and citation omitted) (emphasis in original). "Discussion of an issue by the [Authority] does not necessarily prove compliance with section" 7123(c), and "the most delicate [§ 7123(c)] questions arise in cases such as the one before us, where . . . the objection is not unmistakable." *Local 900, Int'l Union of Elec., Radio & Mach. Workers v. NLRB*, 727 F.2d 1184, 1191, 1193 (D.C. Cir. 1984). The "delicate" nature of the issue, combined with the fact that it is unnecessary to the disposition of this appeal, counsel against deciding the question.

Second, the Authority's precedent describing its collateral estoppel doctrine implies that the Authority *itself* can be collaterally estopped in its own proceedings by its prior decisions. In adopting the collateral estoppel doctrine in *Scott Air Force Base*, the Authority spoke in terms of both "the party [being] precluded," and "the Authority [being] estopped," 35 F.L.R.A. at 983; s*ee also U.S. Dep't of Energy W. Area Power Admin., Golden, Colo.*, 56 F.L.R.A. 9, 9-12 (2000) (discussing

4

whether the administrative law judge was collaterally estopped). To the extent the Authority suggested that collateral estoppel applies to itself, however, the Authority misconstrues the collateral estoppel doctrine. In *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074 (D.C. Cir. 1987) (en banc), the court explained the difference in considering whether the Federal Energy Regulatory Commission ("FERC") was "precluded" from changing its statutory interpretation of a provision that gave licensing preference to municipal, rather than private, power plants, after the Eleventh Circuit had already upheld its opposite interpretation:

> It is true as a general matter that preclusion principles can apply to parties to administrative proceedings . . . . The doctrine of preclusion is meant to prevent *parties* from rearguing issues they have already lost. . . . It was the *decisionmaker*, FERC, that changed its position. Thus, to the extent preclusion analysis is appropriate at all, it is applicable to the extent FERC participated as a *party* before the Eleventh Circuit. Preclusion principles are meant to provide an affirmative defense that one *party* to a prior proceeding may raise against another *party* that took an adverse position in that proceeding.

*Id.* at 1080 n.5 (second emphasis in original); *see also United States v. Andrews*, 479 F.3d 894, 900 (D.C. Cir. 2007) (stating that collateral estoppel "requires that a *party* be estopped from relitigating an identical issue previously decided.") (emphasis added); BLACK'S LAW DICTIONARY 298 (9th ed. 2009) (defining collateral estoppel as "a doctrine barring a *party* from relitigating an issue determined against that *party* in an earlier action.") (emphasis added).

To the extent collateral estoppel is relevant in the instant case, it is not a question of whether the Authority is precluded by its order as the *decisionmaker* in *PTO I*, it is instead whether the Authority was arbitrary and capricious in not precluding the Union from relitigating against the PTO an issue it had lost in *PTO I*.[1] Although the Authority, or arbitrators and administrative law judges may reach an incorrect decision in applying (or not applying) the collateral estoppel doctrine to parties' arguments, they, as adjudicators, are not *themselves* "estopped" by prior decisions. Because "collateral estoppel . . . [is an] affirmative defense[] that must be pleaded," *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 476 (1998) (internal quotation marks and citation omitted), or else is waived, *see Dep't of Treasury v. FLRA*, 762 F.2d 1119, 1121 (D.C. Cir. 1985), it is odd to speak of the Authority as being estopped in its own proceedings.

This is not to say that an agency cannot ever be precluded or estopped in administrative proceedings. Instead, an agency may be precluded, whether in an administrative adjudication or in court, if it was in the position of a *party* in an earlier adversary proceeding and attempts, as a party in a later

---

[1] In concluding that our precedent suggests the PTO's exceptions may not have sufficiently raised a collateral estoppel argument, I suggest no deviation from the general rule that res judicata (or claim preclusion) and collateral estoppel (or issue preclusion) apply to final decisions of administrative tribunals. *See* Op. at 14 n.7. Had the Authority provided a reasoned explanation for departing from its precedent, it would be necessary to decide whether the court has jurisdiction and if so to address the merits of the collateral estoppel argument. Furthermore, *Clark-Cowlitz* confirms that the Authority misapplies the collateral estoppel doctrine to itself; but neither it nor I suggest decisions of administrative agencies cannot have preclusive effect.

proceeding, to relitigate an issue. *Cf. Graphic Commc'ns Int'l Union, Local 554 v. Salem-Gravure Div. of World Color Press, Inc.*, 843 F.2d 1490, 1493 (D.C. Cir. 1988); *see also Drummond v. Comm'r of Soc. Sec*, 126 F.3d 837, 841 (6th Cir. 1997); *Medina v. INS*, 993 F.2d 499, 503–04 (5th Cir. 1993); 18 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4475 (2d ed. 2002) (citing cases). Because the Authority's order in *PTO I* was held to be unappealable, *see Patent Office Prof'l Ass'n v. FLRA*, 180 F. App'x 176 (D.C. Cir. 2006); 5 U.S.C. § 7123(a)(1), the Authority was not a *party* in any proceeding to which issue preclusion could apply to its *PTO I* order. The importance of clarity and precision in distinguishing between precedent that may bind an adjudicator (absent a reasoned explanation for departure) and the effect of collateral estoppel on parties is highlighted by the operation of statutes strictly limiting judicial review of agency adjudications to those claims specifically urged before the agency, as illustrated above. *See, e.g.*, 5 U.S.C. § 7123(c) (governing judicial review of Authority orders); 29 U.S.C. § 160(e) (governing judicial review of National Labor Relations Board orders); 15 U.S.C. § 717r(b) (governing judicial review of Federal Energy Regulatory Commission orders).

**B.**

As the court recounts, *see* Op. at 4–5, in *PTO I*, the Authority concluded that Section A.2[2] of the parties' agreement

---

[2] Section A.2 of the parties' agreement provides:

The [PTO] shall request OPM approval for the next five years to increase the special pay schedule so as to maintain the 10% and 15% salary differentials relative to the updated GS rates, in a manner consistent with OPM regulations. If OPM refuses the request, the Agency shall enter into discussions with [the Union] in order to provide substantially equivalent

of January 4, 2001, was not an "appropriate arrangement" under 5 U.S.C. § 7106(b)(3)[3] because it "ameliorates adverse effects that result from the operation of law, not the exercise of a management right." *PTO I*, 60 F.L.R.A. at 842. In particular, the Authority rejected the Union's argument that Section A.2 was instead an "appropriate arrangement" in response to the PTO's elimination of paper patent files and inclusion of a customer service element in performance plans. *Id.* To the contrary, the Authority upheld in the instant case an arbitrator's conclusion that Section A.2 *was* an "appropriate arrangement" aimed at ameliorating the effects of the elimination of paper patent files and the introduction of customer service requirements. *See U.S. Dep't of Commerce Patent & Trademark Office*, 65 F.L.R.A. 290, 295–96 (2010) ("*PTO II*").

The Authority's denial that it departed from its *PTO I* precedent is unavailing. As the court explains, *see* Op. at 10–11, the Authority relied on the proposition that different arbitrators can interpret the same contract differently based on their being "presented with different facts and arguments," *PTO II*, 65 F.L.R.A. at 295, to suggest that there has been no departure from precedent. This is plainly wrong. The Authority, not the arbitrator, ruled in *PTO I* that Section A.2 was unlawful under 5 U.S.C. § 7106(b)(3). The Authority must, consistent with the

alternatives.

For purposes of the instant appeal there is no relevant distinction between the first and second sentences. *See* Op. at 11–12.

[3] 5 U.S.C.§ 7106, "Management rights," provides in subsection (b)(3): "Nothing in this section shall preclude any agency and any labor organization from negotiating . . . (3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials."

Administrative Procedure Act's requirements, squarely address why this precedent should be changed: "[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency *glosses over* or swerves from prior precedents without discussion it may cross the line from tolerably terse to intolerably mute." *W & M Props. of Conn., Inc. v. NLRB*, 514 F.3d 1341, 1347 (D.C. Cir. 2008) (internal quotation marks and citation omitted) (emphasis added). Because the Authority failed to provide a reasoned analysis for departing from its precedent, I concur in the judgment granting the petition for review.

## II.

A final note regarding the Authority's collateral estoppel doctrine is in order. The Union as intervenor contends that because *PTO I* was held unappealable, it was not collaterally estopped by *PTO I* from arguing in the instant case that Section A.2 was an "appropriate arrangement." Because *PTO I* did not involve review of an unfair labor practice arbitration, this court lacked jurisdiction to review the Authority's order. *See Patent Office Prof'l Ass'n*, 180 F. App'x 176; 5 U.S.C. § 7123(a)(1).

As a general matter, collateral estoppel does not apply to preclude relitigation of an issue when the earlier determination was unappealable. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 28 (1982). "The fact that an agency adjudication was subjected to judicial review and was upheld is a factor that supports giving it preclusive effect." *Id.* § 83, cmt. c. The purpose of this exception is to "ensure the quality of the initial decision," 18 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 4421 (2d ed. 2002), before binding future litigants to it. The court's precedent is clear that a party is not precluded, by an unappealable agency

determination, from litigating an issue in a later *court* proceeding. *See Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 648 (D.C. Cir. 1998); *Alabama Mun. Distribs. Grp. v. FERC*, 312 F.3d 470, 473 (D.C. Cir. 2002). Although the court has yet to decide whether this exception applies to prevent preclusion in subsequent *administrative* proceedings, it has emphasized that "administrative proceedings vary much more widely than judicial proceedings" and thus "as a general matter preclusion principles are to be applied more flexibly to administrative adjudications than to judicial proceedings." *Clark-Cowlitz*, 826 F.2d 1074, 1080–81 n.5; *see also* RESTATEMENT (2D) JUDGMENTS § 83(1) & cmt. f (applying rules and exceptions for judicial collateral estoppel, §§ 27-28, to administrative collateral estoppel).

In *Scott Air Force Base*, the Authority adopted its collateral estoppel doctrine based on the requirements that "courts have determined . . . must be satisfied." 35 F.L.R.A. at 982. In so doing the Authority had no occasion to determine whether the general exception to collateral estoppel for unappealable determinations would also apply to the Authority's application of the collateral estoppel doctrine; *Scott Air Force Base* involved Authority review of unfair labor practice arbitrations, *see id.* at 983, cases over which judicial review is available, *see* 5 U.S.C. § 7123(a)(1). Similarly, the Authority had no occasion to consider whether other general exceptions to the doctrine would apply in its proceedings, for example where there are intervening changes in law, where factors relating to the allocation of jurisdiction between two adjudicative bodies are implicated, or where the burden of persuasion has shifted between the parties in the subsequent action. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 28(1)-(5) (1982), *see also id.* § 83(1) & cmt. f.

The Union's contention raises the appealability question unaddressed by the Authority in *Scott Air Force Base* and unanswered by this court's precedent. The *reason PTO I* was unappealable is, however, critical to whether the exception applies. There is a "major distinction [] between decisions of a sort that ordinarily cannot be appealed and decisions that are ineligible for appeal only because of some special circumstance." 18A WRIGHT & MILLER § 4433. Preclusion is denied to cases of the latter category, *e.g.*, where a case becomes moot pending an appeal. *Id.* On the other hand, "[d]ecisions of a sort that ordinarily cannot be appealed may be surrounded by alternative protections or special policies that support preclusion." *Id.* Such is the case here, where *PTO I* was not made unappealable by special circumstances, but by Congress. In enacting 5 U.S.C. § 7123(a)(1), Congress was concerned with aligning the scope of judicial review of private and public sector arbitrations and "the conferees determined it would be inappropriate for there to be subsequent review by the Court of Appeals in such matters." H.R. Conf. Rep. No. 95-1717, at 153 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2860, at 2887 (1978); *see U.S. Dept Navy v. FLRA*, 665 F.3d 1339, 1344 (D.C. Cir. 2012).

Because Congress deemed the Authority qualified to provide the final judgment on arbitration awards not involving unfair labor practice allegations, the concern underlying the general rule that only appealable decisions have preclusive effects — *i.e.*, that appellate review "ensure[s] the quality of the initial decision," 18 WRIGHT & MILLER, § 4421 — does not apply. And so the Authority erred in failing to apply collateral estoppel to the Union's attempt to reargue that Section A.2 was an "appropriate arrangement." The broader question, whether this and other exceptions to the collateral estoppel doctrine also apply to agencies' applications of the doctrine (as they do to courts), remains to be decided another day.